**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**SHEILA ANN FOUCH,**

　　　　**Plaintiff,**

v.　　　　　　　　　　　　　　　　**CASE NO. 2:12-cv-00659**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

　　　　**Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB"), supplemental security income ("SSI"), and Widow's Insurance Benefits, under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Sheila Ann Fouch (hereinafter referred to as "Claimant"), filed applications for SSI, DIB and disabled widow's benefits on April 19, 2010, alleging disability as of September 11, 2006, due to a right ankle injury, depression, and mental problems from a head injury. (Tr. at 10, 164-66, 167-68, 169-72, 195-203, 245-49, 253-58.) The claims were denied initially and upon reconsideration. (Tr. at 10, 80-84, 85-89, 90-94, 100-02, 103-05, 106-08.) On January 10, 2011, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 109-16.) The video hearing was held on October 17, 2011 before the

Honorable John W. Rolph. (Tr. at 26-73, 120, 127, 152, 154.) At the hearing, Claimant's representative amended the disability onset date to March 1, 2010. (Tr. at 61.) By decision dated October 27, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-25.) The ALJ's decision became the final decision of the Commissioner on January 19, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On March 7, 2012, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§

404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant meets the insured status requirements of the Social Security Act through September 30, 2014.  (Tr. at 13.)  The ALJ stated that it was previously found that Claimant is the unmarried widow of the deceased insured worker and has attained the age of 50.  Claimant meets the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act. The prescribed period ends on June 30, 2012.  Id.  The ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the amended alleged onset date, March 1, 2010.  Id.  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of ankle pain and traumatic arthritis of the bilateral ankles status-post fracture of the right talus resulting in open reduction internal fixation of the right ankle and left ankle chip fracture; numbness and pain of the right elbow and arm status-post fracture; obesity; major depressive disorder; generalized anxiety disorder; and posttraumatic stress disorder.  (Tr. at 13-16.)  At the third

3

inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16-18.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 18-24.) As a result, Claimant can return to her past relevant work as an automobile insurance agent. (Tr. at 24.) On this basis, benefits were denied. Id.

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 52 years old at the time of the administrative hearing. (Tr. at 33.) She

4

is a high school graduate, attended West Virginia Community College but did not complete a degree, and is a licensed insurance agent. (Tr. at 63, 367.) In the past, she worked as a customer service insurance sales representative at an insurance company, a retail representative/sales clerk at a clothing store, a sales clerk at a retail store, a substance abuse tech at a treatment center, and a receptionist at a car dealership. (Tr. at 197, 224.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Health Evidence

Records indicate Claimant was treated at Logan Regional Medical Center [LRMC] Emergency Department [ED] on April 8, 2006 for injuries received in a "MVA [motor vehicle accident] 4/2/06, c/o [complaints of] neck pain, knot in neck. 'Hit head on by another vehicle.'" (Tr. at 312.) Shahram Askari, M.D., radiologist, stated that cervical spine x-rays showed:

> Three views of the cervical spine were obtained and failed to demonstrate any radiographic evidence of acute fracture, subluxation. Normal prevertebral soft tissue. The intervertebral disc spaces are well preserved. The airway remains patent.
>
> IMPRESSION: Normal radiographic evaluation of the cervical spine.

(Tr. at 317.)

On September 11, 2006, Claimant was treated at LRMC ED following a MVA head-on collision. (Tr. at 278-308.) Due to the severity of her injuries, she was transported to Charleston Area Medical Center [CAMC], General Division, the following day. (Tr. at 283.) CTs and X-rays taken at LRMC showed: Claimant had a normal cervical spine CT (Tr. at 289, 304); a normal CT scan of the head showing "some moderate soft tissue swelling

overlying the right frontoparietal region" (Tr. at 290); fractures of the right fifth, sixth, and seventh ribs (Tr. at 293, 301, 307); "no fracture or dislocation noted to the left foot" (Tr. at 294, 346, 350); "? left talar fracture" (Tr. at 296, 348); "fracture right talus [foot] (Tr. at 295, 347); "Right Ankle...fracture of the talar neck with separation to the fragments...Complete fracture of the talus" (Tr. at 297, 349); "right hand..two screw fixation to the fifth metacarpal. The radiograph of the wrist had suggested a fracture of the fourth metacarpal shaft which is not well visualized in this examination" (Tr. at 298); "Right wrist...? hairline in the right navicular and fracture of the 4th metacarpal shaft extending into its base" (Tr. at 299); "Right Forearm...no fracture identified" (Tr. at 300); "no gross fracture or dislocation noted to the pelvis" (Tr. at 302); "Lumbar Spine...fracture, left transverse process L1" (Tr. at 303); "CT scan of the abdomen with contrast...The liver...appear normal...The gallbladder is within normal limits. The spleen and pancreas shows no abnormalities. The adrenals appear normal. There is a 4 cm cyst in the posterior aspect of the right kidney" (Tr. at 306).

On September 12, 2006, Claimant was admitted to CAMC for injuries received in a head-on MVA in Logan County on September 11, 2006. (Tr. at 318-35.) Claimant underwent a "[c]omplex closure of right forehead and scalp, right forehead and scalp avulsive defect measuring approximately 6 cm x 6 cm with a total of 15 cm length of lacerations." (Tr. at 321.) She underwent a "[r]ight displaced talar neck fracture...[o]pen reduction internal fixation...using 3 Synthos 4.5 cm cannulated screws." (Tr. at 322.)

CTs and X-rays taken at CAMC on September 12, 2006 showed: "CT of the cervical spine...No definite signs of fracture" (Tr. at 327); "CT head without contrast...Cephaloematoma external to the right parietal region of the skull. Otherwise no

signs of acute hemorrhage, infarction, midline shift or extraaxial fluid collections" (Tr. at 328); "Chest...Right basilar atelectasis. Otherwise no gross signs of acute infiltrates or signs of failure" (Tr. at 329); "Pelvis...No gross signs of fracture or dislocation" (Tr. at 330); "Right humerus...No gross signs of acute fracture or dislocation" (Tr. at 331); "Right elbow...There is irregular hypodensity noted along the lateral aspect...in the soft tissue, which could be consistent with a history of laceration...which could represent foreign debris...No gross signs of acute fracture or dislocation" (Tr. at 332); right forearm, right wrist and right hand showed "[n]o gross signs of acute fracture or dislocations" although "postoperative changes in the...fifth metacarpal with orthopedic screws" were noted (Tr. at 333-35).

On September 15, 2006, at CAMC, Claimant had a "debridement of scalp/forehead wound and dressing change...revealing healthy appearing wound healing...The sutures along the inferior aspect of the forehead laceration were removed and we were able to obtain better eyebrow symmetry with soft tissue relaxation. No evidence of skin or muscle necrosis was noted." (Tr. at 324.)

Claimant was discharged from CAMC on September 19, 2006 with this summary from Michael D. Hall, M.D.:

> This is a 46-year-old female restrained driver involved in a head-on motor vehicle crash. She was traveling at approximately 55 miles per hour. She suffered a loss of consciousness.
> INJURY LIST:
> 1. Concussion.
> 2. Left ankle sprain grade TT.
> 3. Right Latus neck fracture.
> 4. Complex avulsion of right scalp and forehead.
> 5. Right elbow fracture.
> 6. Right rib fracture.
>                       *       *       *

7

HOSPITAL COURSE: This patient presented initially at Logan General Hospital.  She was sent to CAMC General Hospital ED for further trauma workup.  She presented as a priority 2.  She had a CCS of 15.  She complained of pain in her right upper extremity, chest and right lower extremity.  She had large avulsion wound on her right forehead.  Her abdomen was soft and nontender.  She was hemodynamically stable in the Trauma Bay.  She was sent directly to OR per Dr. Henderson and Dr. Soon.  She was then admitted to the 5-South Trauma Unit.  She was started on clear liquid diet and progressed to regular without difficulty.  The patient was allowed to do slide board transfers from bed to chair with Physical Therapy.  She progressed slowly.  She was able to use a Cam walker on her left lower extremity to maintain a nonweight bearing on her bilateral lower extremities.  She was prophylaxed for DVT with TEDs, SCDS and Lovenox.  She underwent a venous duplex of her bilateral lower extremities, which was negative.  She is successfully using her incentive spirometer.

CONDITION ON DISCHARGE: The patient is awake, alert and oriented.  She moves all extremities.  She continues to wear Cam walker on her left lower extremity.  She is doing well with transfers from bed to chair.  She will be discharged to home with durable medical equipment.

(Tr. at 319-20.)

Claimant was treated by John Pierson, M.D. and Carl Y. Seon, M.D., Bone and Joint Surgeons, Inc. on ten occasions between September 12, 2006 and November 29, 2007 for a right displaced talar neck [foot ankle] fracture.  (Tr. at 353-63.)

At the initial visit on September 12, 2006, Dr. Seon noted that Claimant was involved in a MVA where "[w]ork-up revealed she did have a right talar neck fracture.  The patient was splinted by Trauma Services and Orthopedics consulted…X-rays show a Hawkins type talar neck fracture…we will plan an ORIF [open reduction internal fixation] of above noted fracture."  (Tr. at 363.)

On October 4, 2006, Dr. Seon noted that Claimant was "doing fairly well…At this point I would like her to maintain nonweight bearing status bilateral lower extremities.  I have written her a script for Lortab 7.5, #60 with no refills.  I have also given her a CAM

walker for her right lower extremity." (Tr. at 362.)

On November 3, 2006, Dr. Seon noted: "At this pont she is to weight bear as tolerated on the left lower extremity.  I have given her crutches.  She is to maintain nonweight bearing of her right lower extremity. I have taught her some home exercises for her right lower extremity."  (Tr. at 361.)

On December 6, 2006, Dr. Seon stated:

The patient has been doing relatively well although she states her left ankle along the medial aspect has begun to swell and becomes painful with prolonged weight bearing...X-rays of her right ankle show the fracture has healed and there is no evidence of subchondral collapse of the talar dome...At this point I would like her to start weight bearing as tolerated, bilateral lower extremities and physical therapy.  I would like to order MRI to rule out an osteochondral lesion of her left talar dome.

(Tr. at 360.)

On January 10, 2007, Dr. Seon noted:

The patient is doing fairly well although she continues to tend to walk on the lateral border of her foot and there was severe commination at the neck and it may have gone into varus slightly, however, I think overall she seems to be doing okay...She does have jointline tenderness at the tibiotalar joint and the incisions have healed well...At this point I would continue with therapy.  I will write a script for Lortab 7.5 mg, #60 with no refills...If she continues to be out from varus I may order an orthotic to help post her and be more comfortable walking.  She did not get an MR of her left ankle.  She states it feels better now.

(Tr. at 359.)

Claimant underwent physical therapy at LRMC on December 12, 2006, December 18, 2006, December 27, 2006, January 5, 2007, January 17, 2007, and January 18, 2007. (Tr. at 336-52.)  Claimant was given an 8-week physical therapy plan but she did not attend the January 25, 2007 session and the physical therapist checked a box stating "Discharged" and noted: "Pt [patient] not returning."  (Tr. at 337, 351-52.)

On February 28, 2007, Dr. Seon noted:

The patient is doing relatively well although she continues to walk on the lateral border of her foot and she may have gone to a varus malunion of her talar neck fracture as there was quite a bit of comminution along the lateral talar neck region...Her heel cord is tight as well and she states she has finished physical therapy, however she has slacked off on her stretching exercises of her ankle and I can get the ankle to approximately 5 degrees of dorsiflexion. Plantar flexion is approximately 30 degrees...X-ray examination reveals the fracture has healed quite nicely.  There is no evidence of talar dome collapse...

At this point I recommend an orthotic to perhaps post her and see if we could correct some of the varus hindfoot and then continue heel cord stretching. If she is not happy then perhaps the only alternative is perhaps an auto-shoe brace versus corrective osteotomy for possible percutaneous heel cord lengthening.  At this point I would like her to follow-up with Dr. Pierson for further care.

(Tr. at 358.)

On June 4, 2007, Dr. Pierson stated:

Mrs. Fouch is following up today almost nine months status post open reduction internal fixation of her right talar neck fracture treated by Dr. Seon. She is complaining of laterally based hind foot pain.  She was given a prescription for an orthotic by Dr. Seon at last visit.  She just now got this filled and has been wearing it for approximately three days.  She has not noticed a difference in her pain at this point.  She does think her pain is getting worse...Exam reveals the incisions to be all well healed, no erythema, no drainage, no swelling.  She has good ankle motion and good subtalar motion. On standing she does walk on the lateral border of her foot...X-rays reveal full healing of the talar neck fracture.  There is no osteolysis of the tibial talar joint.  No evidence of osteonecrosis...

I recommend triangular orthotic for at least three weeks to see if she gets any symptomatic relief before considering surgery.  I think especially on the lateral view there is some prominence of the heads of the lateral 2 cannulated screws.  If we are going to attempt any type of surgical intervention at this point I would probably just recommend simple hardware removal.  I would avoid any type of corrective osteotomy unless simple hardware removal did not relieve the patient's pain.  If she is going to require corrective osteotomy I would probably refer her to Morgantown to foot and ankle specialists.

(Tr. at 357.)

10

On September 11, 2007, Dr. Pierson noted:

Ms. Fouch is following up one year status post open reduction internal fixation of a talus fracture by Dr. Seon.  She is still complaining of significant pain along the lateral aspect of her foot.  She states it is worse with walking, worse at the end of the day.  She is wanting to consider hardware removal as this had been discussed previously...

Physical examination reveals good range of motion of the ankle joint.  She does have some stiffness of the subtalar joint.  She is tender especially laterally over the screw heads which are palpable under the skin.  She also has tenderness over the medial aspect of the ankle over the 4.5 mm cannulated screw head.

X-rays reveal good healed talar neck fracture.  I do not see any evidence of avasular necrosis.  No evidence of collapse of the talar dome.  There is one screw laterally which is sticking out of the talar head significantly on the lateral view.  The other two remaining screw heads are somewhat prominent.  There is lysis seen around one lateral screw anteriorly around the screw head in the area of the lateral navicular.  There is some lysis seen about the medial navicular about one of the screw heads.  These two appear to be 4.5 mm cannulated screws.

Assessment:
1.  Fracture Talus - 825.21 (Primary)
2.  Retained Headware Problem - 996.40
3.  Malunion of fracture - 733.81...

PLAN: I discussed with Ms. Fouch treatment options.  Dr. Seon previously discussed possible osteotomy.  Given the very prominence of the screw heads and some lysis seen I do think it would be reasonable to start simply with hardware removal before considering any type of open osteotomy.  We discussed the risks of surgery including but not limited to bleeding, infection, damage to nerve or blood vessels, the possibility of incomplete relief and need for revision procedure.  Simple hardware removal could return her back to function quickly and may result in significant amount of pain relief.  I told her I am unsure how much pain relief she would obtain but given the lower morbidity associated with screw removal we will start with this first.  She is agreeable and wishes to proceed.  We will get this scheduled at our earliest mutual convenience.

(Tr. at 355.)

On November 8, 2007, Dr. Pierson noted:

Ms. Fouch is following up status post hardware removal in her foot.  The patient is doing well.  She states she has already seen some significant relief after the hardware removal...EXAM reveals mild fluctuant fluid collection over the superolateral incision.  There is no erythema, no warmth, no signs of infection.  Incisions are well healed with no signs of infection, no drainage...

PLAN: Continue activities as tolerated.  If the fluid collection does not resolve, we could consider aspiration in a few weeks but I will hold off at this time.  I will see her back as needed in the future if she has any further questions or concerns.

(Tr. at 354.)

On November 29, 2007, Dr. Pierson stated:

Ms. Fouch is following up on her right ankle hardware removal.  The patient is doing well but she complains of a fluctuant mass over the dorsal aspect of the foot and tenderness.  She states it gets worse at the end of the day...EXAM reveals unchanged fluctuant mass over the dorsal aspect of the foot. This was present her postoperative visit...

PLAN: I did aspirate approximately 3-4 cc of bloody fluid from the mass.  It does not appear cloudy, does not appear to be infected.  She has no clinical evidence of infection on exam.  She does have a thickened area over her peroneus tertius tendon which was repaired during surgery which is likely a thickened scar.  I did place her into a compression dressing and would like to see her back in 4 weeks and check her symptoms.  If the scarred area is a problem for her, we could even likely under local make a small incision and remove that small lump of nonabsorbable suture.  We will see how much of her symptoms are coming from the cyst.  Hopefully it will not reaccumulate. I will see her back in 4 weeks and check her symptoms at that point.

(Tr. at 353.)

On May 3, 2010, Robert Perez, M.D., Logan Regional Medical Center, stated in a largely illegible handwritten report:

Moving here - in Chapmanville - to take care of her mother...Chief complaint: Rt [right] ankle pain and swelling...Anxiety...Obese Wt [weight] 194, Ht [height] 63" BMI [body mass index] 34 ½...

Assessment
(1)     Chronic pain right ankle s/p [status post] ORIF

(2)    Anxiety & insomnia
(3)    HTN [hypertension] - lifestyle modification, wt reduction, eat less, exercise at the pool
(4)    Obesity

(Tr. at 364-65, 425-26, 458-59.)

On June 30, 2010, handwritten unsigned records accredited to Dr. Perez state: "Wt 194...Same weight. swimming a lot...sleeping well...chronic pain right ankle/arthritis." (Tr. at 424, 457.)

On July 27, 2010, a State agency medical source provided an internal medicine examination of Claimant. (Tr. at 372-80.) The examiner, Kathleen M. Monderewicz, M.D., Tri-State Occupational Medicine, Inc., provided a consultative examination report which concluded:

**IMPRESSION**:
1.    Probable traumatic arthritis of both ankles, status post open reduction internal fixation of right talus fracture and history of grade 2 sprain and chip fracture of left ankle.  Recent x-rays of joints not available.

2.    Possible tendinopathy of the right shoulder with anterior tenderness and mild decreased range of motion.

3.    Non tender decreased range of motion of the cervical spine with no evidence of cervical radiculopathy or myelopathy.  Decreased sensation over the right hand appears related to prior right hand lacerations.  Mild weakness in the right upper extremity appears due to findings on right shoulder exam as well as history of right elbow laceration and fracture and hand lacerations.

4.    Non tender decreased range of motion of the spine with no evidence of lumbar radiculopathy.

5.    Moderate obesity with BMI of 35.

**SUMMARY**: The claimant should avoid maintaining the legs in a prolonged dependent position with sitting, standing, and driving due to swelling of the ankle joints. Standing, walking, squatting, kneeling, and crawling are limited by chronic ankle pain and decreased balance with squatting.  The claimant

13

should avoid climbing in heights as well as walking on uneven ground due to decreased balance on the ankles and laxity of the left ankle. Use of the right upper extremity for reach, push, pull, and overhead reach appears mildly limited by findings on shoulder examination. Heavy lifting is limited by inability to fully squat on the ankles and loss of balance with squatting. Right grip appeared mildly weak but fine manipulation appeared normal bilaterally with coin pick up.

(Tr. at 377.)

On August 25, 2010, handwritten unsigned records accredited to Dr. Perez state: "Wt 192...Same achy ankle, aggravated by walking...not sleeping well w/o [without] meds...chronic right ankle pain, HTN not optimally controlled, anxiety and insomnia, obesity." (Tr. at 423, 456.)

On August 27, 2010, a State agency medical source completed a Physical Residual Functional Capacity Assessment [PRFCA]. (Tr. at 396-404.) The evaluator, Amy Wirts, M.D. stated that Claimant's primary diagnosis was "s/p [status post] MVA 9/11/06 s/p R [right] talus fracture"; her secondary diagnosis was " R hand two screw fixation 5th metacarpal"; and that her other alleged impairments were "left transverse process L1 fracture." (Tr. at 396.) Dr. Wirts concluded that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal work breaks) for a total of about 6 hours in an 8-hour workday and must periodically alternate sitting and standing to relieve pain or discomfort, and that push and/or pull (including operation of hand and/or foot controls) were limited in lower extremities. (Tr. at 397.) Dr. Wirts explained: "Mild to moderate limitation RLE [right lower extremity], no repetitive pushing, pedaling, and stomping; avoid walking on uneven terrain; must periodically alternate sitting and standing every 15 to 30 minutes to relieve pain or discomfort in the R ankle."

14

Id. She opined that Claimant could perform all postural limitations "occasionally" save for climbing ladder/rope/scaffolds, which she marked "never." (Tr. at 398.) Regarding "Manipulation Limitations," she marked that Claimant was "limited" in "reaching all directions (including overhead), handling (gross manipulation); fingering (fine manipulation)" but was "unlimited" in "feeling (skin receptors)" and stated "occasional limitation in R shoulder and R hand in reaching in all directions including overhead and in gross and fine manipulation." (Tr. at 399.) Dr. Wirts stated that Claimant had no visual, communicative or environmental limitations, save to avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. at 399-400.) She concluded:

> Claimant's statements are mostly credible. Claimant is s/p MVA 9/11/06 with complete fracture of the talus extending through the talar neck seen on R ankle x-ray 9/11/06. R hand x-ray 9/11/06 shows two screw fixation of the fifth metacarpal. L transverse process L1 fracture seen on lumbar spine 9/11/06. CE 7/27/10 shows when he [sic, she] ambulates, there is an inversion deformity of the R ankle and foot, causing the claimant to ambulate on the lateral aspect of the R foot. The claimant does not require the use of a handheld assistive device.

(Tr. at 401.)

On October 21, 2010, handwritten unsigned notes attributed to Dr. Perez state: "Chronic right ankle pain, HTN not optimally controlled, anxiety and insomnia, obesity." (Tr. at 422, 455.)

A handwritten unsigned note dated October 27, 2010, states the patient "[i]s wanting to know if you were gonna write something for her depression." Id. Below this note is another written in a different handwriting, presumably Dr. Perez's: "Citalopran 20 mg #30 daily refill # one." Id.

On December 13, 2010, a State agency medical source completed a Case Analysis.

(Tr. at 412, 413.)  The evaluator, A. Rafael Gomez, M.D. concluded: "I have reviewed all the evidence in file and the PRFC of 8/27/10 is affirmed as written." Id.

On December 20, 2010, Dr. Perez's nearly illegible progress notes state in part: "Citalopran seems to help (will increase to 40 mg).  Anxiety better.  Not sleeping well."  (Tr. at 421, 454.)

On February 15, 2011,  Dr. Perez's nearly illegible progress notes state in part: "Wt 192, Ht 63...Losing weight intentionally.  Appetite controlled.  Tried to walk (exercise), ankles got painful.  Anxiety controlled...Sleeping better...Chronic right ankle pain/arthritis, HTN BP [blood pressure] controlled, anxiety/insomnia/depression."  (Tr. at 420, 453.)

On February 28, 2011, James Henderson, M.D., CAMC Physician's Group, Facial Surgery Center, stated:

> This is a patient who I have seen in the past regarding complex forehead injuries.  The right side of the forehead had a complex avulsive scalp wound and this is repaired.  Postoperatively, she was followed for a period of time and it was noted that she did have some elevation of the right brow due to the cicatrix involving the forehead region.  She also had some loss of the facial nerve function on that side.  At this point, she is interested in resolving the brow asymmetry...We plan on contacting Crime Victim's assistance and obtain authorization for this.

(Tr. at 431.)

On April 12, 2011, unsigned handwritten office notes attributed to Dr. Perez state in part: "Wt 191...Seen by psychiatrist Dr. Thornton.  Still stays depressed...Stays in pain. Stays anxious... Extremities: no edema."  (Tr. at 419, 452.)

On April 20, 2011, Dr. Perez completed a West Virginia Department of Health and Human Resources Medical Review Team (MRT) General Physical form.  (Tr. at 460-62.) Dr. Perez stated that Claimant was under his care for "arthritis, chronic right ankle pain,

HTN, anxiety, depression, insomnia." (Tr. at 460.)  He noted regarding her gait: "walk on [illegible] side of right foot."  (Tr. at 461.) He noted her weight to be 189 pounds and that her speech, posture, and ears were normal.  Id.  He marked two areas as abnormal: "Psychiatric" - "anxiety, depression, insomnia" - and "Orthopedic" - "chronic right ankle pain."  Id.  Asked to "[d]escribe in detail  any pain," he wrote: "Constant, sharp, 8/10, [illegible] right ankle pain aggravated by walking, standing, carrying heavy objects."  Id. He listed the diagnosis as: "Major: Chronic right ankle pain, traumatic arthritis; Minor: HTN, anxiety, depression, insomnia."  Id.  He marked "No" to the questions: "Is applicant able to work full-time at customary occupation or like work?" and "Is applicant able to perform other full time work?" (Tr. at 461-62.)  As an explanation, he stated: "Constant right ankle pain and anxiety, depression; unable to remember anything; worrying a lot." (Tr. at 462.) Dr. Perez wrote "chronic condition" in response to the phrase: "Duration of inability to work full time."  Id. He concluded: "Patient has chronic right ankle pain and anxiety and depression.  Worrying a lot and problem with her memory affecting her capability to work effectively."  Id.

On June 9, 2011, unsigned nearly illegible handwritten office notes attributed to Dr. Perez note: "191...same weight.  Not walking much. Hurting more. Has been swimming. Not eating much. Celexa changed to Cymbalta by psychiatrist, helping better.  Lot of ankle pain (right)." (Tr. at 451.)

On August 25, 2011, Dr. Henderson performed left brow ptosis repair under anesthesia on Claimant.  He stated that Claimant was "recovered and discharged to follow up in 1 week."  (Tr. at 449.)

On September 1, 2011, Dr. Henderson stated: "The patient presents today for

17

followup status post a left brow ptosis repair.  The patient is doing relatively well...She has good brow elevation and position, minimal ecchymosis.  At this point, the staples were removed today and we will plan on having her follow up as needed." (Tr. at 428.)

On September 8, 2011, unsigned handwritten office notes attributed to Dr. Perez note: "191...same weight.  Now taking Lexapro instead of Cymbalta.  Right ankle giving out on her... constant pain, cannot stand for long time."  (Tr. at 450.)

<u>Mental Health Evidence</u>

On July 14, 2010, Kelly Robinson, M.A., licensed psychologist, Psychological Assessment Intervention Services, Inc., completed a psychological evaluation of Claimant. Ms. Robinson reported:

> **GENERAL OBSERVATIONS**
> Ms. Fouch is a 50 year old, divorced, unemployed, white female.  She identified herself by driver's license.  She is 5'4" tall and weighs 180 pounds...She walked with a normal gait and maintained a normal posture. She had good use of all limbs and is right handed.  She had no apparent vision or hearing problems.  Speech production was good with normal rate and volume.  No speech problems were noted.  She drove herself to the interview unaccompanied.
>
> *       *       *
>
> Ms. Fouch reports no mental health treatment.
>
> *       *       *
>
> **MENTAL STATUS EXAMINATION**
>
> **Orientation** - She was alert throughout the evaluation.  She was oriented to person, place, time and date.
>
> **Mood** - Observed mood was euthymic.
>
> **Affect** - Affect was broad and reactive.
>
> **Thought Processes** - Thought processes appeared logical and coherent.

18

**Thought Content** - There was no indication of delusions, obsessive thoughts or compulsive behaviors.

**Perceptual** - She reports no unusual perceptual experiences.

**Insight** - Insight was fair.

**Judgment** - Within normal limits based on her response to the finding the letter question.  She stated "drop it in the mail."

**Suicidal/Homicidal Ideation** - She denies suicidal and homicidal ideation.

**Immediate Memory** - Immediate memory was within normal limits.  She immediately recalled 4 of 4 items.

**Recent Memory** - Recent memory was within normal limits.  She recalled 3 of 4 items after 30 minutes.

**Remote Memory** - Remote memory was within normal limits based on ability to provide background information.

**Concentration** - Concentration was mildly deficient based on her score of six on the Digit Span subtest of the WAIS-III.

**Psychomotor Behavior** - Normal.

### DIAGNOSTIC IMPRESSION

| | | |
|---|---|---|
| Axis I: | 296.32 | Major Depressive Disorder [MDD], Recurrent, Moderate |
| | 300.02 | Generalized Anxiety Disorder [GAD] |
| Axis II: | V71.09 | No Diagnosis |
| Axis III: | By self report: right ankle problems | |

### RATIONALE

Ms. Fouch was given the diagnosis of Major Depressive Disorder, Recurrent, Moderate based on the following criteria; withdrawal from people, feelings of worthlessness, depressed mood, fatigue, an increase in weight and appetite, difficulty concentrating, feelings of sadness, a diminished interest in activities and sleep difficulty.  She reports depressed mood for about five days per week.  She reports a decline from her previous level of functioning.  She was given the diagnosis of Generalized Anxiety Disorder based on the following criteria: lack of patience, irritability, feelings of nervousness,

excessive worry, breathing difficulty, muscle tension, restlessness, difficulty concentrating, sleep difficulty and headaches.  She finds it difficult to control the worry.

## DAILY ACTIVITIES
**Typical Day**:
Ms. Fouch goes to bed at 9:00 pm and gets up at 6:00 am.  She describes her typical day as "get up, have coffee with my mom, watch the news, she has a pool, so we sit out by the pool, her and I together will cook something, that's about it."

**Activities**:

**Daily** -        talks with her mother and stepfather, takes her medications, makes her bed, washes the dishes by hand, watches tv, talks with friends and her children on the phone, showers and goes to bed.  She could identify no other daily activities as she states "the pain in my right ankle, I have to sit down and put my ankle up cause it swells too bad and it's too painful."

**Weekly** -      goes to the grocery store with her mother.  She stays about 20 minutes.  She states "I have to have a cart to walk with."

**Monthly** -     goes to the pharmacy independently.  She denies any related problems.

**Hobbies/Interests**:          swimming due to "it helps my ankle."

## SOCIAL FUNCTIONING

During the evaluation, social functioning was within normal limits based on her interaction with the examiner and the staff.

## CONCENTRATION

Attention/concentration were mildly deficient based on her score of six on the Digit Span subtest of the WAIS-III.

## PERSISTENCE

Persistence was within normal limits based on the MSE.

## PACE

Pace was within normal limits based on the MSE.

20

**CAPABILITY TO MANAGE BENEFITS**

Ms. Fouch appears capable to manage any benefits she might receive.

(Tr. at 366-71.)

On August 7, 2010, a State agency source completed a Psychiatric Review Technique form.  (Tr. at 381-95.)  The evaluator, G. David Allen, Ph.D., concluded that Claimant's affective and anxiety-related disorders, MDD and GAD, were not severe.  (Tr. at 381-86.) Dr. Allen found that Claimant had no limitation in restriction of activities of daily living and no episodes of decompensation.  (Tr. at 391.)  He determined that Claimant had a mild degree of limitation regarding difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  Id. He found that the evidence did not establish the presence of the "C" criteria.  (Tr. at 392.)  Dr. Allen concluded:  "Partial credibility perceived - it seems the alleged severity of functional limitation related to psych MDI's [multiscore depression inventory] is not confirmed by observational data in the file." (Tr. at 393.)

On November 27, 2010, a State agency medical source completed a Case Analysis. (Tr. at 410.)  The evaluator, Paula J. Bickham, Ph.D., concluded: "The claimant does not report a change in her condition nor make a new allegation on the 3441 and recon AFR.  I have reviewed all of the evidence in the file and the PRTF of 8/7/2010 is affirmed as written."  Id.

On February 16, 2011, Bruce W. Dolin, B.A., Prestera Center, completed an initial assessment form. He noted Claimant to be "a very depressed and withdrawn individual." (Tr. at 486.)  He marked that Claimant's appearance, sociability, speech, thought content and motor activity were within normal limits; that she was oriented to person, place,

situation, and time; that her recall memory was normal; her coping ability "exhausted"; her affect and eye contact appropriate; her sleep inadequate; her appetite good; and that she had no suicidal or homicidal thoughts.  (Tr. at 487-88.)  He stated her diagnosis to be "Major Depressive Disorder, Recurrent, Unspecified" and her current GAF score to be 55.  (Tr. at 488-89.)

Records indicate Claimant was a patient of Ted Thornton, M.D., at Prestera Center for ten office visits from February 21, 2011 to September 21, 2011.  (Tr. at 466-89.)  On February 21, 2011, Dr. Thornton wrote in a largely illegible handwritten initial intake note that he diagnosed Claimant with "MDD 296.32, GAD 300.02, PTSD [post traumatic stress disorder]" and prescribed "Celexa" and "Xanax."  (Tr. at 485.) On the subsequent office visits, Dr. Thornton noted that Claimant's mental status showed:  "Interpersonal Demeanor: Interacts well; Eye Contact: Direct; Appearance: Appropriate; Sleep: Adequate; Appetite: Baseline; Energy: Fair; Suicidal: N[o]; Homicidal: N[o]; Stream of Thought: Normal; Content of Thought: Appropriate, Informative; Cognitive Functioning: Baseline."  (Tr. at 467, 469; 471, 473, 475, 479, 481, 483.) Regarding "Affect", Dr. Thornton circled "Constricted" until the two most recent visits, when he circled "Appropriate" and "S/W." Id.  Regarding "Mood", Dr. Thornton circled "dysphoric" save one occasion on August 22, 2011 where he circled "Euthymic." Id. On that date, Dr. Thornton wrote: "Notes depression better but temper worse."  (Tr. at 468.)

On October 3, 2011, Dr. Thornton completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form.  (Tr. at 463-65.)  Dr. Thornton marked that Claimant had a "Fair" ability to follow work rules and use judgment.  (Tr. at 463.)  He marked that Claimant had a "Poor" ability to relate to co-workers, deal with the public,

interact with supervisors, deal with work stresses, function independently, and maintain attention/concentration because "Patient suffers from depression and complains of poor concentration and people skills." (Tr. at 463-64.) He marked that Claimant had "None" ability to understand, remember and carry out complex job instructions; had a "Poor" ability to understand, remember and carry out detailed, but not complex job instructions; and "Fair" ability to understand, remember and carry out simple job instructions because "Patient reports residual dysphoria and anxiety." (Tr. at 464.) He marked that Claimant has a "Good" ability to maintain personal appearance; a "Fair" ability to behave in an emotionally stable manner and demonstrate reliability; and a "Poor" ability to relate predictably in social situations because "Patient notes difficulty with concentration." Id. Dr. Thornton marked that the Claimant does not have the capability to manage benefits in her own best interest. (Tr. at 465.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ did not follow the treating physician rule or provide supportable reasons for rejecting the opinions of the treating physicians, Dr. Perez and Dr. Thornton; (2) the ALJ failed to include all of Claimant's limitations in the hypothetical questions to the Vocational Expert and in the Residual Functional Capacity finding; (3) the ALJ erred in finding Claimant to be not credible; (Pl.'s Br. at 4-15.)

The Commissioner's Response

The Commissioner asserts that the Commissioner's decision is supported by substantial evidence because (1) the ALJ provided good reasons for discounting the opinions of Drs. Perez and Thornton; (2) the ALJ did not err in assessing Claimant's RFC;

and (3) the ALJ did not err in assessing that Claimant's self reported symptoms and functional limitations were not entirely credible. (Def.'s Br. at 3-20.)

<u>Analysis</u>

<u>Weighing Medical Opinions</u>

Claimant first argues that the ALJ erred "because he failed to follow the treating physician rule and failed to provide supportable reasons for rejecting the treating physicians' opinions." (Pl.'s Br. at 4.) Specifically, Claimant asserts:

> Ms. Fouch's treating physician, Robert Perez, M.D., offered his opinion that Ms. Fouch's physical capabilities were seriously limited and that Ms. Fouch was unable to work. The ALJ entirely rejected Dr. Perez's opinion...
>
> Which radiological findings or treatment records do not support Dr. Perez's opinion? How do the radiological findings and treatment notes not support Dr. Perez's findings? SSR 96-2p requires the ALJ to provide specific reasons supporting his analysis of a treating physician opinion...Here the ALJ's decision not only requires this Court to guess which records the ALJ may have been referring to but also requires this Court to guess why the ALJ believed the records were not consistent with Dr. Perez's opinion. The ALJ failed to meet his legal duty of explanation.
>
> Ms. Fouch takes particular offense to the ALJ's repeated statements throughout his decision that Ms. Fouch did not have treatment after her ankle surgery until the time she filed her application. Ms. Fouch does not make this allegation lightly, but the ALJ knew this statement was not true. Both Ms. Fouch and her counsel specifically addressed this issue at the hearing. Ms. Fouch explained to the ALJ at the hearing that she treated with Dr. Anita Dawson during the time in question but Dr. Dawson's office had closed. (Tr. 56-57)....While it is unfortunate that Dr. Dawson's records were not obtainable, this hardly means Ms. Fouch did not obtain medical treatment.
>
> Finally, the ALJ claimed Dr. Perez did "...not provide a basis for his opinion." (Tr. 23). This is blatantly untrue. Dr. Perez specifically stated his opinion was based on "...right ankle pain aggravated by walking, standing, carrying heavy objects" and "constant right ankle pain and anxiety and depression unable to remember anything; worrying a lot." (Tr. 461, 462).
>
> The ALJ's handling of Dr. Thornton's opinion is similarly deficient....

24

Once again, the ALJ did not even attempt to explain which of Dr. Thornton's treatment notes the ALJ believed were inconsistent with the Doctor's opinion.  Likewise, the ALJ offered no explanation why he believed the treatment notes were inconsistent with Dr. Thornton's opinion.

While Dr. Thornton may have properly considered Ms. Fouch's allegations, in part, when expressing his opinion, this is not a legitimate reason for the outright rejection of the opinion.

(Pl.'s Br. at 5-7.)

The Commissioner responds that substantial evidence supports the ALJ's decision that the opinions of Drs. Perez and Thornton were not entitled to controlling weight.  (Def.'s Br. at 10-14.)  Specifically, the Commissioner asserts:

Here, the ALJ found that the opinions of Dr. Perez and Dr. Thornton were neither supported by nor consistent with the rest of the record....

Plaintiff started to treat with Dr. Perez as her primary care physician in 2010 around the time she filed her disability applications (Tr. 418-426).  On April 20, 2011, Dr. Perez completed a form stating that Plaintiff had chronic right ankle pain, anxiety, depression, hypertension and insomnia rendering her unable to work (Tr. 462).  The ALJ found that Dr. Perez's opinion was neither supported nor consistent with the record or any radiological findings (Tr. 23).

Specifically...Dr. Perez claimed that Plaintiff had hypertension, however, his treatment notes from February 21, 2011 and June 9, 2011 indicated that Plaintiff's hypertension was controlled (Tr. 15).  The ALJ also noted that Dr. Perez claimed that Plaintiff had insomnia, but the ALJ noted that Dr. Perez based his diagnosis on Plaintiff's subjective complaints, rather than any tests or studies (Tr. 15).  Dr. Perez's opinion also stated that Plaintiff could not work because of her condition, when his contemporaneous notes clearly indicated that Plaintiff stopped working to take care of her mother. (Compare Tr. 364 with Tr. 462)....

Dr. Perez's opinion concerning Plaintiff's right ankle pain and mental condition are inconsistent with the opinions of at least six medical professions: Dr. Monderewicz, Dr. Wirts, Dr. Gomez, Dr. Allen, Dr. Bickman, and Kelly Robinson (Tr. 372-77, 396-404, 412-13).

In her brief, Plaintiff takes issue with the ALJ's statement that Dr. Perez's opinion was not supported by any radiological findings (Pl.'s Brief at 6). Plaintiff misses the point.  Dr. Perez opines that Plaintiff had chronic right

ankle pain, but the last time Plaintiff treated with a specialist in the field was in 2007 when Plaintiff's orthopedic surgeon released her (Tr. 40). Moreover, in 2006, when Plaintiff had an x-ray of her ankle, it revealed a fracture, but not a dislocation (Tr. 295). Despite the three to four year lag in time in Plaintiff's treatment, when Plaintiff treated with Dr. Perez, the doctor did not order any radiological tests or any studies (Tr. 418-26). Nor did Dr. Perez refer Plaintiff to an orthopedic specialist (Id). Instead, Dr. Perez's treatment notes indicate that he listened to Plaintiff's complaints of pain, and simply prescribed her pain medication (Id). Similarly, Dr. Perez finds that Plaintiff had depression and anxiety, but his treatment notes do nothing more than restate Plaintiff's self-reported diagnoses (Id).

Moreover, the ALJ explained that Plaintiff reported activities of daily living that are inconsistent with Dr. Perez's opinion. Specifically, Plaintiff reported preparing meals, washing clothes, making her bed, cleaning her room, driving a car, shopping, and swimming, among other activities (Tr. 239-41, 369). These activities are incompatible with allegations of a work precluding ankle injury....

Plaintiff started to treat with Dr. Thornton as her psychiatrist in 2011, the year after she filed her disability applications alleging that her "depression and other mental problems" prevented her from working. On October 3, 2011, Dr. Thornton assessed that Plaintiff had a poor ability to relate to co-workers; deal with the public; interact with supervisors; deal with work stresses; function independently; maintain attention and concentration; understand, remember, and carry out detailed, but not complex instructions; and relate predictably in social situations (Tr. 463-65). The ALJ found that Dr. Thornton's findings, similar to Dr. Perez's findings, were not supported by Plaintiff's treatment records and rather based solely on Plaintiff's subjective complaints (Tr. 24). The ALJ noted that this was problematic since the ALJ (as the exclusive authority on credibility) found that Plaintiff was not credible (Tr. 24).

In her brief, Plaintiff argues that the ALJ's finding with regard to Dr. Thornton was improper because the ALJ did not explain which of Dr. Thornton's notes were inconsistent with his findings and how they were inconsistent. This argument is inaccurate. The ALJ noted that Dr. Thornton consistently assigned Plaintiff a GAF score from 55 to 60, indicating no more than moderate limitations (Tr. 20). The ALJ then contrasted Dr. Thornton's unduly restrictive mental assessment with his own benign treatment notes indicating that Plaintiff's mood was euthymic, her affect was broad and reactive, her thought processes were logical and coherent, she had no evidence of delusions, obsessive thoughts, or compulsive behaviors, her insight was fair, and her judgment was within normal limits (Tr. 21). Dr. Thornton's notes also indicate Plaintiff made direct eye contact, interacted

well, and that her medications were helping her improve (Tr. 470, 472, 474, 476, 478, 480, 482).

Moreover, the ALJ pointed out that Dr. Thornton's opinion conflicted with the findings of the state psychologist, Kelly Robinson (Tr. 21). Dr. Thornton's opinion conflicted with the opinions of Dr. Allen and Dr. Bickman too (Tr. 381-85, 410-11). Finally the ALJ pointed out that Dr. Thornton's opinion was inconsistent with Plaintiff's daily activities, which included talking on the phone (daily) as a social activity (Tr. 21, 220).

(Def.'s Br. at 11-14.)

In a Reply to Defendant's Brief, Claimant argues that the Commissioner has erroneously included "new rationale the Commissioner, in hind sight, wishes the ALJ had included in the decision." (Pl.'s Reply Br. at 2.) More specifically, Claimant asserts:

Ms. Fouch must first correct an important error contained in the Commissioner's brief. The Commissioner frames the issue herein as "[t]he ALJ determined that the opinions of Dr. Perez and Dr. Thornton were not entitled to controlling weight. Plaintiff argues that, under the treating physician rule, such a determination was inappropriate." (Def's Br., Doc. 14 at 11).

Ms. Fouch made no such argument. To be clear, the ALJ entire rejected Dr. Perez's opinion and gave "little weight" to Dr. Thornton's opinion. The issue here has nothing to do with "controlling weight." The issue before this Court is the ALJ's failure to properly consider the treating physician's opinions - an error of law. More specifically, the ALJ was required to consider a number of factors when weighing a treating physician's opinion and required to set forth clear and specific reasons for the weight given to a treating physician's opinions. Here the ALJ fulfilled neither of these legal duties.

(Pl.'s Reply Br. at 1-2.)

Claimant then quotes the second paragraph of page 23 of the ALJ's Decision and states:

The above quotation contains the entirety of the ALJ's discussion of Dr. Perez's opinion. The Commissioner knows well that he must defend the ALJ's decision based on the reasoning relied on by the ALJ. The Commissioner cannot now rehabilitate errors in the ALJ's reasoning with new rational the Commissioner, in hind sight, wishes the ALJ had included

in the decision.  This is exactly what the Commissioner has done in his brief.

(Pl.'s Reply Br. at 2.)

Next Claimant argues:

The Commissioner claims the ALJ relied on the issues of hypertension and insomnia as reasons for rejecting Dr. Perez's opinion.  (Def's Br., Doc. 14 at 12.)  The quote above shows no such reasoning was offered by the ALJ.  The Commissioner next stated Dr. Perez's opinion was "...inconsistent with the opinions of at least six medical professions..." (*Id.*)  Again, the ALJ did not rely on any such reasoning.  The Commissioner then provides a lengthy discussion of the x-ray evidence.  (*Id.*)  Unfortunately, no such reasoning is found in the ALJ's discussion of Dr. Perez's opinion.  Finally, the Commissioner wrote, "...the ALJ explained that Plaintiff reported activities of daily living that are inconsistent with Dr. Perez's opinion." (*Id.*)  This assertion is simply false.  The ALJ offered no such explanation in regard to Dr. Perez's opinion.  Notably, the Commissioner provided no citation to where such reasoning could be found in the decision.

In regard to Dr. Thornton's opinion, the Commissioner, similarly, failed to defend the actual reasoning offered by the ALJ, but, instead, offered improper *post hoc* reasoning in an attempt to rehabilitate the deficiencies in the ALJ's decision.

(Pl.'s Br. at 4.)

Claimant then states "[t]he entirety of the ALJ's reasons for rejecting Dr. Thornton's

opinion is as follows", quotes the last sentence of the first paragraph of page 24 of the ALJ's

Decision, and asserts:

The Commissioner wrote, "[t]he ALJ then contrasted Dr. Thornton's unduly restrictive mental assessment with his own benign treatment notes..." (Def's Br., Doc. 14 at 14.)  The ALJ offered no such discussion.  All the ALJ did was summarily assert that Dr. Thornton's opinion was not consistent with his own notes without any explanation.  The Commissioner next wrote, "...the ALJ pointed out that Dr. Thornton's opinion conflicted with the findings of the state psychologist, Kelly Robinson." (*Id.*)  Again, this assertion is false.  The ALJ offered no such reasoning.  Finally, the Commissioner wrote, "...the ALJ pointed out that Dr. Thornton's opinion was inconsistent with Plaintiff's daily activities..." (*Id.*)  Once again, this assertion is entirely false.  The above quote clearly shows the ALJ did not rely on any such reasoning as a basis for the rejection of Dr. Thornton's opinion.

28

(Pl.'s Reply Br. at 5.)

The ALJ made these extensive findings regarding the opinion evidence, including the opinions of Drs. Perez and Thornton (emphasis added to the discussion of their evidence):

> In terms of the claimant's bilateral ankle impairments, records from Logan Regional Medical Center dated September 11, 2006, documented the claimant was involved in a head on motor vehicle accident, which resulted in an injury of the bilateral ankles (Exhibit 1F). At the time, the claimant underwent x-rays of the right foot, which revealed evidence of a complete fracture of the talus through the talar neck (Exhibit 1F, p. 18). In addition, the claimant underwent x-rays of the left ankle that showed evidence of a fracture of the talus without displacement (Exhibit 1F, p. 19). Thereafter, on September 12, 2006, the claimant underwent open reduction and internal fixation of the right ankle (Exhibit 2F, p. 5). Subsequent treatment records dated in 2007 indicated the claimant's hardware was removed from the right ankle (Exhibit 4F, p. 2).
>
> More recently, on July 27, 2010, Kathleen M. Monderewicz, M.D., performed a physical consultative examination of the claimant. At that time, Dr. Monderewicz diagnosed the claimant with probable traumatic arthritis of both ankles, status post open reduction internal fixation of the right talus fracture, and history of grade-two sprain and chip fracture of the left ankle. In addition, the physician noted the claimant had evidence of an inversion deformity of the right foot and ankle, as well as tenderness over the anterior joint line and medial ligament (Exhibit 7F, p. 5). Also, the physician noted that toe walking caused increased pain of the claimant's right ankle. She was able to squat only two-thirds of the way down, while holding on to furniture, due to pain of her ankle (Exhibit 7F, p. 5). Additionally, notes from the claimant's physical consultative examination documented the claimant had swelling and increased warmth over the medial aspect of the left ankle, as well as laxity of the left ankle joint with inversion (Exhibit 7F, p. 5). Subsequent treatment notes dated October 21, 2010, documented the claimant had chronic pain of the right ankle (Exhibit 14F, p. 5). **More recently, on April 20, 2011, the claimant's treating physician, Robert Perez, M.D., diagnosed the claimant with chronic pain of the right ankle and traumatic arthritis (Exhibit 17F, p. 2)**.
>
> In terms of the claimant's status-post injury of the right upper extremity, treatment records dated September 11, 2006, documented the claimant underwent x-rays of the right wrist, which showed evidence of a questionable hairline fracture of the right navicular, as well as a fracture of the fourth

metacarpal shaft extending into its proximal articular surface (Exhibit 1F, p. 22). Also, the claimant underwent x-rays of the right elbow, which showed evidence of a laceration with foreign debris (Exhibit 2F, p. 15). An additional Discharge Summary dated September 19, 2006, documented the claimant had a diagnosis of right elbow fracture (Exhibit 2F, p. 2).

In terms of the claimant's obesity, as noted above, on July 27, 2010, Dr. Monderewicz performed a physical consultative examination of the claimant. At that time, the physician documented the claimant was 5' 3" and weighed 198 pounds; her body mass index (BMI) was 35 (Exhibit 7F, p. 3).

In terms of the claimant's severe mental impairments, on July 14, 2010, Kelly Robinson, M.A., performed a psychological consultative examination of the claimant and diagnosed her with major depressive disorder, recurrent, moderate and generalized anxiety disorder (Exhibit 6F). At that time, the claimant reported feelings of worthlessness, depressed mood, and difficulty concentrating. Also, she indicated having excessive worry, headaches, muscle tension, restlessness, and difficulty breathing (Exhibit 6F, p. 4). **Additional treatment records indicated the claimant has undergone treatment with Ted Thornton, M.D., for depression, anxiety, and posttraumatic stress disorder since February 2011 (Exhibit 19F).**

The undersigned finds the above impairments are established by the medical evidence and are "severe" within the meaning of the Regulations, because they cause limitations in the claimant ability to perform basic work.

In terms of the claimant's non-severe physical impairments...the undersigned recognizes that notes from the claimant's physical consultative examination with Dr. Monderewicz indicated the claimant had a diagnosis of possible tendinopathy of the right shoulder with anterior tenderness and mild decreased range of motion (Exhibit 7F, p. 6). The undersigned notes there are no additional treatment records or radiological findings corroborating this diagnosis. In addition, there is no evidence indicating the claimant underwent any treatments of the right shoulder subsequent to her amended alleged onset date. Moreover, the examining physician, Dr. Monderewicz documented the claimant had only a mild decrease in range of motion of the right shoulder. Accordingly, the undersigned finds the claimant's diagnosis of possible tendinopathy of the right shoulder is not supported by the objective medical evidence of record, and therefore concludes it is non-severe.

**Also, a progress note from the claimant's treating physician, Dr. Perez, dated May 3, 2010, documented the claimant had a diagnosis of hypertension. At that time, the claimant's blood pressure was 150/90 (Exhibit 5F, p. 2). However, additional notes**

dated February 15, 2011, and June 9, 2011, stated the claimant's hypertension was controlled (Exhibits 14F, p.3 and 16F, p. 2). In addition, the undersigned notes the evidence of record indicates the claimant has required only conservative treatment for hypertension. In fact, there is no evidence indicating the claimant has been hospitalized, undergone surgical procedure, or been treated by a specialist for limitation of her physical abilities due to this impairment. Accordingly, the undersigned finds the claimant's hypertension has less than a minimal impact on the claimant's ability to perform basic work-like activities, and therefore is non-severe.

A more recent progress note from Logan Regional Medical Center [Dr. Perez] dated April 12, 2011, documented the claimant had a diagnosis of hyperlipidemia (Exhibit 16F, p. 3). An additional note indicated the claimant was prescribed Crestor for the impairment (Exhibit 16F). There is no evidence of record indicating the claimant required intensification of treatment for this impairment. In addition, the claimant has not alleged disability due to hyperlipidemia. Furthermore, the undersigned finds no findings that would support a limitation of her physical abilities due to hyperlipidemia, and therefore concludes it is a non-severe impairment.

Additionally, treatment records from James Henderson, M.D., dated August 15, 2011, documented the claimant underwent a left brow ptosis repair (Exhibit 15F, p. 23). Subsequent treatment records from Dr. Henderson dated September 1, 2011, stated the claimant was doing relatively well. The undersigned recognized that Dr. Henderson indicated the claimant reported having some paresthesia of the supraorbital nerve; however, she indicated that her sensation was beginning to return (Exhibit 15F, p. 2). In addition, the undersigned notes the claimant does not allege disability due to this impairment. Furthermore, the record does not contain any findings that would support a limitation of her physical abilities due to a brow repair. Accordingly, the undersigned finds this impairment has less than a minimal impact on her ability to perform basic work-like activities, and therefore is non-severe.

Further, the undersigned recognizes that treatment notes from Dr. Perez document the claimant has been diagnosed with insomnia (Exhibit 14F). However, the diagnosis of insomnia appears to be based only on the claimant's subjective complaints, and she is not entirely credible. Furthermore, the record does not contain any findings that would support a limitation of her physical or mental abilities due to insomnia. Accordingly, the undersigned finds the claimant's diagnosis of insomnia has less than a minimal impact on the claimant's ability to perform basic work-like activities, and therefore is non-severe.

31

To be a severe impairment the medical evidence must establish more than a slight abnormality or combination of slight abnormalities which would have more than a minimal effect on an individuals ability to work. The impairment must significantly limit a person's physical or mental ability to do basic work activities (SSR 85-28) for a continuous period of at least twelve months. The undersigned finds that the above named impairments are "not severe" (20 C.F.R. 404.1520(a) and (c) and 416.920(a) and (c) and SSR 96-3p) in that they cause no more than minimally vocationally relevant limitations.

As noted above, the undersigned recognizes the claimant was involved in a motor vehicle accident in September of 2006, which resulted in multiple injuries (Exhibits 1F and 2F). The undersigned notes that all evidence of record has been reviewed and considered; however, only the treatment notes relevant to the claimant's amended onset date are addressed in this decision. In addition, after a review of the evidence of record, the undersigned finds the claimant had essentially no treatment for the majority of her injuries subsequent to her 2006 motor vehicle accident and recovery. Also, the claimant's earnings records indicated that she had work that rose to the level of substantial gainful activity in 2007, and significant work in 2008, 2009, and 2010 (Exhibit 6D). Furthermore, at the hearing, the claimant amended her alleged onset date to March 1, 2010, due to work after her original onset date and limited treatment records. Accordingly, the undersigned has addressed only the evidence that is relevant to this amended onset date in this decision.

In addition, the undersigned recognizes that there are treatment records in Exhibit 1F, which are dated before the claimant's motor vehicle accident. Although the undersigned has reviewed and considered all evidence of record, only the records relevant to the claimant's current application and amended onset date are addressed in this decision (Exhibit 1F, pp. 34, 35, 36, 37, 38, 39, and 40).

\*      \*      \*

Additionally, the objective evidence does not support the claimant's extreme mental complaints and limitations. As noted above, the undersigned recognized that on July 14, 2010, Ms. Robinson performed a psychological consultative examination of the claimant and diagnosed her with major depressive disorder, recurrent, moderate and generalized anxiety disorder (Exhibit 6F). **In addition, treatment notes from the claimant's psychiatrist, Dr. Thornton, documented the claimant had a diagnosis of posttraumatic stress disorder (Exhibit 19F). However, these diagnoses appear to be based only on the claimant's subjective complaints and not objective findings. In**

**fact, notes from the psychological examination indicated the claimant's mood was euthymic, and her affect was broad and reactive. Also, her thought processed were logical and coherent. She had no evidence of delusions, obsessive thoughts, or compulsive behaviors. Her insight was fair, and her judgment was within normal limits. Further, notes indicated the claimant's immediate, recent, and remote memory was within normal limits.** In addition, Ms. Robinson documented the claimant's concentration was only mildly deficient, and her persistence and pace were within normal limits [Exhibit 6F]. Ms. Robinson noted the claimant appeared capable of managing any benefits that she might receive, and her prognosis was fair (Exhibit 6F, p. 5). In addition, the claimant reported daily activities that are inconsistent with the severity of her allegations. Specifically, she reported making her bed, washing her dishes by hand, watching television, and talking with friends and her children on the telephone. Also, she indicated laying by the pool and swimming during the summer (Exhibit 6F). The undersigned notes that the findings noted above are inconsistent with the severity of claimant's allegations.

**In addition, the undersigned recognizes the claimant's treatment records indicated that she was receiving a prescription for Xanax from Dr. Perez at her alleged onset date; however, there is no evidence that she sought treatment from a psychologist or other mental health profession until 2011 (Exhibit 14F and 19F). Furthermore, treatment notes from Ted Thornton, M.D., of Prestera Center indicated the claimant's global assessment of functional scores consistently ranged between 55 and 60, indicating no more than a moderate limitation (Exhibit 19F). In addition, the undersigned notes there is no mention of the claimant's alleged daily crying spells or panic attacks in her treatment notes, or in the notes from her psychological consultative examination (Exhibit 14F and 19F).** Moreover, the undersigned has accounted for limitations resulting from the claimant's mental impairments in the residual functional capacity discussed earlier in the decision.

The undersigned recognizes the claimant testified that her medications cause dizziness, headaches, and lightheadedness. However, nowhere in the medical records do similar complaints appear. Where there is a discrepancy between the claimant's testimony and her medical records, the undersigned must question the credibility of the claimant's testimony.

The evidence of record indicates the claimant left her job for reasons other than disability. In fact, at the hearing, the claimant testified that she last worked as a cashier at Dollar General in Ritchie County, West Virginia, at the

beginning of 2010.  She noted that she left the job in order to move back in with her parents in Logan, West Virginia.  **Also, in 2010, the claimant reported to Dr. Perez that she was moving back to Logan to take care of her elderly parents, which further indicates her impairments are not as severe as alleged (Exhibit 5F).**

In terms of the claimant's activities of daily living, at one point or another in the record (either in forms completed in connection with the application and appeal, in medical records, or in the claimant's testimony), the claimant has reported the following daily activities: preparing meals, washing clothes, making her bed, cleaning her room, driving a car, shopping, and swimming. The undersigned notes the claimant has described daily activities, which are not limited to the extent one would expect given her complaints of disabling symptoms and limitations.

In addition, the undersigned recognizes the claimant testified that she underwent treatment from a physician named Anita Dawson between 2007 and 2010; however, there is no evidence of record corroborating the claimant's testimony.

As for the opinion evidence, on July 27, 2010, Dr. Monderewicz, the claimant's examining physician, opined the claimant should avoid maintaining her legs in a prolonged dependent positions with sitting, standing, and driving due to swelling of the ankle joints.  Also, standing, walking, squatting, kneeling, and crawling are limited by chronic ankle pain and decreased balance with squatting. Additionally, the physician opined the claimant should avoid climbing heights, as well as walking on uneven ground due to decreased balance on the ankles and laxity of the left ankle.  The claimant's use of her right upper extremity for reach, push, pull, and overhead reaching appeared mildly limited by findings on the shoulder examination.  Further, Dr. Monderewicz opined that heavy lifting was limited by an inability to fully squat on the ankles and loss of balance with squatting. Her right grip appeared mildly weak, but fine manipulation appeared normal bilaterally when picking up coins (Exhibit 7F).  The undersigned gives great weight to the opinion of Dr. Monderewicz because the physician's opinion is consistent with the claimant's treatment records, the objective findings of record, and the record as a whole.

On August 27, 2010, Amy Wirts, M.D., a reviewing physician for the state agency, completed a Physical Residual Functional Capacity Assessment form. At that time, Dr. Wirts opined the claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She noted the claimant could stand and/or walk for a total of six hours out of an eight-hour workday and sit for a total of six hours out of an eight-hour workday.  However, she noted the claimant must periodically alternate sitting and standing to relieve pain or

discomfort. In addition, Dr. Wirts opined the claimant had mild to moderate limitations of the right lower extremity. Specifically, the doctor indicated the claimant should not engage in repetitive pushing, pedaling, or stomping. Also, the claimant should avoid walking on uneven terrain. Dr. Wirts indicated the claimant must periodically alternate sitting and standing every 15 to 30 minutes to relieve pain or discomfort of the right ankle (Exhibit 9F). Further, the physician opined the claimant could occasionally engage in the climbing of ramps and stairs, stooping, kneeling, crouching, and crawling. However, she should never engage in the climbing of ladders, ropes, or scaffolds. Further, this individual should only occasionally engage in reaching in all directions including overhead reaching and gross and fine manipulation with the right upper extremity. Additionally, Dr. Wirts opined the claimant should avoid concentrated exposure to extreme cold, vibrations, and hazards such as heights and machinery. The physician documented the claimant's statements were mostly credible (Exhibit 9F). Thereafter, on December 13, 2010, A. Rafael Gomez, M.D., another reviewing physician for the state agency, affirmed the opinion (Exhibit 12F). The undersigned gives significant weight to the opinions of Dr. Wirts and Dr. Gomez because their opinions are consistent with the record as a whole.

**On April 20, 2011, Dr. Perez opined the claimant was unable to work a full-time occupation due to constant pain of the right ankle, as well as depression and anxiety. He noted the claimant had difficulty remembering things, and she worried a lot. Furthermore, the doctor noted the claimant's impairments were chronic (Exhibit 17F). The undersigned rejects the opinion of Dr. Perez because his opinion is not supported by the radiological findings of record or the claimant's treatment records. In fact, the claimant had very little treatment of the right ankle subsequent to her accident and recovery until right after she filed her claim for disability in April of 2010. Furthermore, Dr. Perez does not provide a basis for his opinion, and his opinion is not consistent with the record as a whole.**

Additionally, on August 7, 2010, G. David Allen, Ph.D., a reviewing psychologist for the state agency, completed a Psychiatric Review Technique form with regard to the claimant's mental functioning. At that time, Dr. Allen opined the claimant had no severe mental impairments. Specifically, she [sic, he] noted the claimant had no limitations in activities of daily living; mild limitations in maintaining social functioning; mild limitations in maintaining concentration, persistence, or pace; no episodes of decompensation; and no "paragraph C" criteria (Exhibit 8F). Dr. Allen noted that partial credibility was perceived. Specifically, he noted the claimant's alleged severity of functional limitation related to psychological medical determinable impairments was not confirmed by observational data in the file (Exhibit 8F).

Thereafter, on November 27, 2010, Paula J. Bickman, Ph.D., another reviewing psychologist for the state agency, affirmed the opinion (Exhibit 11F). The undersigned gives significant weight to the opinions of Dr. Allen and Dr. Bickman because the psychologist's opinions are consistent with the record as a whole. However, the undersigned finds the claimant is more limited based on her combination of impairments.

Thereafter, on March 10, 2011, the claimant's treating psychiatrist, Dr. Thornton, completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form with regard to the claimant's psychological functioning. At that time, the psychiatrist opined the claimant had a poor ability to relate to co-workers; deal with the public; interact with supervisors; deal with work stresses; function independently; maintain attention and concentration; understand, remember, and carry out detailed, but not complex instructions; and relate predictably in social situations (Exhibit 18F). The undersigned gives little weight to the opinion of Dr. Thornton because the opinion is not consistent with the psychiatrist's own treatment notes, and his opinion expressly based on her subjective complaints, and her allegations have been determined to not be credible in many aspects (Exhibit 19F).

In sum, the above residual functional capacity assessment is supported by the radiological findings of record, the claimant's treatment notes, the opinions of Ms. Robinson and Mr. [sic, Dr.] Monderewicz, and the record as a whole.

(Tr. at 13-16, 21-24.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more

36

weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2011). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2011). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2011). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted

above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. §§ 404.1527(d)(2), 416.927(d)(2).

As demonstrated by the emphasized areas of the ALJ's decision, contrary to Claimant's assertions the ALJ did not find the opinions of Dr. Perez and Dr. Thornton to be unworthy of controlling weight  in just one part of his decision.  (Pl.'s Br. at 5-6, 7.)   Nor did the ALJ fail to comply with 20 C.F.R. §§ 404.1527 and 416.927.  (Pl.'s Br. at 5.)    Nor did the Commissioner's brief improperly contain arguments that it "in hind sight wishes the ALJ had included."  (Pl.'s Reply Br. at 3-4.)  As previously mentioned, a treating physician's opinion is given controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence.  In the subject claim, the ALJ acknowledged Drs. Perez and Thornton as the treating physicians and discussed at great length Dr. Perez' treatment records and opinions, as well as Dr. Thornton's treatment records and opinions.  (Tr. at 13-16, 21-24.) The ALJ specifically stated that the assessments were not supported by clinical and laboratory techniques and were inconsistent with other substantial evidence. (Tr. at 23, 24.) The ALJ specifically discusses radiological findings and treatment records that are

inconsistent with the severity of Claimant's allegations with regard to her problems of the bilateral ankles and right upper extremity.  (Tr. at 20-23; also see pages 67-68 of this PF&R.)

The ALJ properly weighed the opinions of Drs. Perez and Thornton against the record as a whole when determining eligibility for benefits as required by 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2011).  The ALJ gave good reasons in his decision for the weight he gave Dr. Perez' opinion.  (Tr. at 13-16, 21-24.)  The ALJ concluded that "the opinion of Dr. Perez…is not supported by the radiological findings of record or the claimant's treatment records…Dr. Perez did not provide a basis for his opinion and his opinion is not consistent with the record as a whole."  (Tr. at 23.) The ALJ also gave good reasons in his decision for the weight he gave Dr. Thornton's opinion.  (Tr. at 13-16, 21-24.) The ALJ concluded that "the opinion of Dr. Thornton…is not consistent with the psychiatrists own treatment notes, and his opinion expressly based upon her subjective complaints."  (Tr. at 24.)

The undersigned notes that Claimant took "particular offense" in the ALJ's discounting of Claimant alleged treatment with Anita Dawson, D.O. stating: "Ms. Fouch explained to the ALJ at the hearing that she treated with Dr. Anita Dawson during the time in question [2007 to 2010] but Dr. Dawson's office had closed…While it is unfortunate that Dr. Dawson's records were not obtainable, that hardly means Ms. Fouch did not obtain medical treatment."  (Pl.'s Br. at 6.)   The undersigned notes that Dr. Dawson's medical license was suspended in April 2010 and was surrendered in September 2011.  She was sentenced in January 2013 to two years in federal prison for violating drug control laws during the period June 2006 through May 2009.  United States v. Dawson, No. 3:12-cr-

00132 (S.D.W.Va. Jan. 7, 2013).

Thus, the undersigned proposes that the presiding District Judge **FIND** that the ALJ complied with 20 C.F.R. §§ 404.1527 and 416.927 in assessing the medical opinion evidence and that contrary to Claimant's assertions, the decision properly acknowledged Dr. Perez and Dr. Thornton as the treating physicians and contained good reasons for rejecting the opinions expressed by Drs. Perez and Thornton in the conclusory forms submitted on April 20, 2011 and October 3, 2011. (Tr. at 460-62, 463-65.)

Residual Functional Capacity [RFC]

Claimant next argues that the ALJ failed to include all of her limitations in the hypothetical questions to the vocational expert and in the Residual Functional Capacity finding. (Pl.'s Br. at 8.) Specifically, Claimant asserts:

> The ALJ claimed he gave "great weight" to the opinion of Dr. Monderewicz. (Tr. 22.) However, the ALJ failed to account for all of the limitations set fourth in Dr. Monderewicz's opinion. Dr. Monderewicz specifically stated Ms. Fouch "...should avoid maintaining the legs in a prolonged dependent position with sitting, standing and driving due to swelling of the ankle joints." (Tr. 377.) Nevertheless, the ALJ's RFC finding provides no allowance for Ms. Fouch to be in any other positions but standing or sitting. (Tr. 18-19.) Thus, Ms. Fouch's legs must remain in a dependent position for a full eight hour workday.
>
> Furthermore, Ms. Fouch testified she needed to elevate her legs during the day to reduce swelling. (Tr. 51, 70-71). This testimony was entirely consistent with Dr. Monderewicz's opinion. The vocational expert (VE) testified that "an individual that has to elevate the leg in my opinion they could not carry out work activities." (Tr. 71). The ALJ simply failed to address this limitation in the RFC finding.
>
> The ALJ found "[t]he claimant may frequently reach in all directions with the dominant right upper extremity, and engage in gross and fine manipulation with the same." (Tr. 18). The ALJ claimed he gave "significant weight" to state agency reviewing physician Amy Wirts, M.D. However, Dr. Wirts opined Ms. Fouch was limited in "Handling (gross manipulations)" and "Fingering (fine manipulation)" but the RFC finding states Ms. Fouch can

"...engage in gross and fine manipulation" with the dominant right upper extremity. (Tr. 399, 18). The RFC finding lists no limitation of these activities.

Finally, the RFC does not include all of Ms. Fouch's mental limitations. The ALJ first found Ms. Fouch "...is fully capable of performing simple and complex work tasks." (Tr. 18). If Ms. Fouch is "fully capable" of performing all simple work tasks and "fully capable" of performing all complex work tasks, how is she limited? Obviously, the ALJ did not include any of the limitations in the RFC finding that were set forth in Dr. Thornton's opinion. However, the ALJ failed to include in the RFC finding limitations the ALJ himself found Ms. Fouch had.

The ALJ found Ms. Fouch was moderately limited in the areas of concentration, persistence and pace. (Tr. 17). Yet, neither the RFC finding nor the hypothetical questions to the VE make any mention of such limitations...

A correct adjudication of Ms. Fouch's mental limitations is critical in this particular claim. The ALJ found Ms. Fouch could return to her past relevant work as an automobile insurance agent. (Tr. 24). According to the VE, this job is a "skilled occupation" with a specific vocational preparation level of 6. (Tr. 66). Thus, a moderate limitation in the areas of concentration, persistence and pace may not be entirely disabling, but such a limitation may well preclude the performance of skilled work. It should have been presented to the VE.

(Pl.'s Br. at 8-10.)

The Commissioner responds that substantial evidence supports the ALJ's finding

that Claimant could perform her past relevant work as an automobile insurance agent.

(Def.'s Br. at 14.) Specifically, the Commissioner asserts:

Plaintiff advances four arguments that the ALJ formulated an RFC that did not include all of her functional limitations, rendering the ALJ's determination improper (Pl.'s Br. at 8-10). Plaintiff's arguments are meritless.

Plaintiff's first argument is that the RFC failed to include a finding that Plaintiff should avoid maintaining her legs "in a prolonged dependent position with sitting, standing and driving due to swelling of the ankle joints" (Pl.'s Br. at 8). This argument is incorrect because the RFC permits Plaintiff "to sit or stand at 15 to 30 minute intervals," which contrary to Plaintiff's

argument, would permit her to avoid maintaining her legs in a *prolonged* dependent position.

Plaintiff's second argument is that the RFC failed to include those limitations with regard to handling (gross manipulations) and fingering (fine manipulation) found by Dr. Wirts (Pl.'s Br. at 8-9). Plaintiff, however, neglects to mention that Dr. Wirts stated Plaintiff is only "occasionally" limited from performing such activity (Tr. 399). Here, the ALJ found that Plaintiff could return to her job as an automobile insurance agent, a job that according to the Dictionary of Occupational Titles is consistent with this de minimus limitation. See DICOT 250.257-010, 1991 WL 672355.

Plaintiff's third argument is that the "ALJ found [Plaintiff] was moderately limited in the areas of concentration, persistence and pace. Yet, neither the RFC nor the hypothetical questions to the VE make any such limitations" (Pl.'s Br. at 9-10). This contention is incorrect. The ALJ noted that Plaintiff's consultative psychological examiner, Kelly Robinson, found that Plaintiff's concentration was no more than mildly limited and her persistence and pace were within normal limits (Tr. 17). Nevertheless, the ALJ gave Plaintiff "the benefit of the doubt with regard to her difficulty concentrating" and therefore found that she had moderate limitation "in the area of concentration, persistence, and pace" for purposes of his step three analysis (Tr. 17). The ALJ then, contrary to the allegations in Plaintiff's brief, *accounted for this limitation* by limiting the RFC (and his hypothetical to the VE) to "work performed in a low stress work environment, defined as one in which there is no production pace, no strict quota requirements, no strict time standards, and no 'over the shoulder' supervision" (Tr. 17, 26).

Plaintiff's fourth argument is that the RFC should have limited her ability to perform complex work tasks (Pl. Brief at 9). Plaintiff, however, points to no substantial evidence in the record for this proposition, rendering the premise of her argument faulty.

Thus, contrary to Plaintiff's assertions, the ALJ's RFC finding reasonably accounts for Plaintiff's functional limitations that are well supported by the evidence of record.

(Def.'s Br. at 15-16.)

In a Reply Brief, Claimant argues:

It is important to note here Dr. Monderewicz specifically noted the dependent position of the legs Ms. Fouch should avoid included both the sitting and standing position. The ALJ's RFC finding requires Ms. Fouch to be in either a sitting or standing position for the entire eight hour day. (Tr. 18-19). The

Commissioner misses this point. The Commissioner argues that the sit/stand option accommodates this limitation. In reality, the sit/stand option actually reinforces Ms. Fouch's argument that the RFC finding allows her to be in no other position but sitting or standing for the entire eight hour workday. This is exactly what Dr. Monderewicz stated Ms. Fouch could not do.

Ms. Fouch argued in her brief that she needed the opportunity to elevate her feet during the day consistent with Dr. Monderewicz's opinion. (Pl.'s Br., Doc. 13 at 8). She further argued the ALJ failed to address this limitation. (*Id.*) The Commissioner did not address this point in his brief.

The Commissioner next argues that Ms. Fouch's limitations with gross and fine manipulations are "de minumus" and consistent with her past relevant work. (Def.'s Br., Doc. 14 at 15). Notably, the Commissioner does not dispute Ms. Fouch's contention that the ALJ did not include these limitations in the RFC finding and did not present these limitations to the vocational expert (hereinafter "VE"). Furthermore, the Commissioner points to no evidence in this record supporting his bold conclusion that Ms. Fouch could perform her past relevant work with limitations of gross and fine manipulation.

Next, the Commissioner's discussion of the ALJ's handling of Ms. Fouch's mental limitations further supports Ms. Fouch's argument. The Commissioner readily admits in his brief that the ALJ found Ms. Fouch "...had moderate limitation 'in the area of concentration, persistence, and pace...'" The Commissioner then readily admits that the ALJ did not present these limitations to the vocational expert but, instead, "accounted for this limitation" by finding that Ms. Fouch could only do certain types of work. It is of no benefit for the ALJ to find claimant has a particular mental limitation but then *unilaterally* decide that such limitation limits the claimant to "low stress work" without ever asking the vocational expert whether or not the actually mental limitation would affect the performance of competitive work. The approach the ALJ took here hides the actual limitations from the vocational expert and reduces the VE's role to nothing more than naming specific jobs that fall within the classification of low stress work, which the ALJ already instructed the VE the claimant could do.

(Pl.'s Reply Br. at 5-7.)

At the October 17, 2011 hearing, the ALJ posed four hypothetical questions to the VE:

Q     All right. Ma'am, I'd like to paint a hypothetical scenario for you. I may then follow it up with some additional questions. Initially I'd like for you to assume a hypothetical individual who's able to lift up to 20 pounds occasionally, lift and carry up to 10 pounds frequently and light work as defined by the regulations. This individual may

occasionally climb ramps and stairs, bend, balance, stoop and kneel but may never climb ladders, ropes, or scaffolds, crouch, crawl.  This individual must be allowed to sit or stand at 15 to 30 minute intervals provided she's not off task more than 10 percent of the work period.  This individual may never use the right lower extremity for pushing, pulling or repetitive foot operations.  This individual may engage in work activities that do not require prolonged walking on uneven terrain.  And this individual may frequently reach in all directions with the dominant right upper extremity and engage in gross and fine manipulation with the same.  This person must avoid concentrated exposure to extreme cold, vibration and hazards such as moving machinery and heights.  If we take into consideration a hypothetical individual with those particular limitations could such an individual so limited perform the past relevant work of our claimant either as she performed it or as it's generally performed in the national economy?

A    Your Honor, I believe that an individual with a history as an insurance agent could carry on that work activity because the number of times the individual would have to change position from seated to standing would not I believe interfere with that work which probably is sedentary.

Q    You defined it as light the way it was performed.

A    Correct.  That was because she was carrying files and what have you.

Q    But in the national economy how would that be - -

A    I believe it's - - let me be sure but I think it is - - it is considered sedentary work.

Q    And obviously if we asked the same hypothetical but at the sedentary exertional level, would our claimant also be able to do her past relevant work?

A    Yes.

Q    To both those hypotheticals I'm going to keep it at the following limitation.  I'd like you to assume that our claimant's fully capable of performing both simple and complex work tasks that are performed in the low stress work environment which I define as one in which there's no production, pace, no strict quota requirements, no strict time standards and no over the shoulder supervision, and if we add that additional limitation to hypotheticals one and two, would our claimant still be able to perform her past relevant work?

A       Yes.

Q       Okay.  Finally then to all three of those hypotheticals, I'd like you to assume that this hypothetical individual due to a combination of severe physical and or mental impairments and associated pain and other symptoms is unable to perform routine work tasks on a regular and continuing basis for a full eight hour day, five days a week, or a 40 hour work week or equivalent work schedule, and if that were the case, would you also find that our claimant could [perform] her past relevant work?

A       Your Honor, an individual with those limitations would not be able to do the past work that this lady has done nor would such an individual be able to sustain gainful activity.

Q       All right, ma'am.  Is your testimony today consistent with the Dictionary of Occupational Titles?

A       It is.

(Tr. at 66-68.)

The ALJ made these findings regarding Claimant's residual functional capacity

[RFC]:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  However, this individual is able to lift up to 20 pounds occasionally and lift and/or carry up to 10 pounds frequently in light work as defined by the regulations.  She may occasionally climb ramps and stairs, bend, balance, stoop, and kneel, but she may never climb ladders, ropes, or scaffolds.  Also, the claimant should never engage in crouching or crawling.  In addition, she must be allowed to sit or stand at 15 to 30 minute intervals, provided she is not off task more than 10 percent of the work period.  She may engage in work activities that do not require prolonged walking on uneven terrain.  The claimant may frequently reach in all direction with the dominant right upper extremity, and engage in gross and fine manipulation with the same. She must avoid concentrated exposure to extreme cold, vibrations, and hazards such as moving machinery and heights.  She is fully capable of performing simple and complex work tasks that are performed in a low stress work environment, defined as one in which there is no production pace, no strict quota requirements, no strict time standards, and no "over the shoulder" supervision.

45

(Tr. at 18-19.)

As discussed earlier, the ALJ made specific findings regarding the opinion evidence,

including that of Ms. Robinson, Dr. Monderewicz and Dr. Wirts:

Ms. Robinson documented the claimant's concentration was only mildly deficient, and her persistence and pace were within normal limits [Exhibit 6F]. Ms. Robinson noted the claimant appeared capable of managing any benefits that she might receive, and her prognosis was fair (Exhibit 6F, p. 5)...

[O]n July 27, 2010, Dr. Monderewicz, the claimant's examining physician, opined the claimant should avoid maintaining her legs in a prolonged dependent positions with sitting, standing, and driving due to swelling of the ankle joints. Also, standing, walking, squatting, kneeling, and crawling are limited by chronic ankle pain and decreased balance with squatting. Additionally, the physician opined the claimant should avoid climbing heights, as well as walking on uneven ground due to decreased balance on the ankles and laxity of the left ankle. The claimant's use of her right upper extremity for reach, push, pull, and overhead reaching appeared mildly limited by findings on the shoulder examination. Further, Dr. Monderewicz opined that heavy lifting was limited by an inability to fully squat on the ankles and loss of balance with squatting. Her right grip appeared mildly weak, but fine manipulation appeared normal bilaterally when picking up coins (Exhibit 7F). The undersigned gives great weight to the opinion of Dr. Monderewicz because the physician's opinion is consistent with the claimant's treatment records, the objective findings of record, and the record as a whole.

On August 27, 2010, Amy Wirts, M.D., a reviewing physician for the state agency, completed a Physical Residual Functional Capacity Assessment form. At that time, Dr. Wirts opined the claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently. She noted the claimant could stand and/or walk for a total of six hours out of an eight-hour workday and sit for a total of six hours out of an eight-hour workday. However, she noted the claimant must periodically alternate sitting and standing to relieve pain or discomfort. In addition, Dr. Wirts opined the claimant had mild to moderate limitations of the right lower extremity. Specifically, the doctor indicated the claimant should not engage in repetitive pushing, pedaling, or stomping. Also, the claimant should avoid walking on uneven terrain. Dr. Wirts indicated the claimant must periodically alternate sitting and standing every 15 to 30 minutes to relieve pain or discomfort of the right ankle (Exhibit 9F). Further, the physician opined the claimant could occasionally engage in the climbing of ramps and stairs, stooping, kneeling, crouching, and crawling. However, she should never engage in the climbing of ladders, ropes, or

46

> scaffolds. Further, this individual should only occasionally engage in reaching in all directions including overhead reaching and gross and fine manipulation with the right upper extremity. Additionally, Dr. Wirts opined the claimant should avoid concentrated exposure to extreme cold, vibrations, and hazards such as heights and machinery. The physician documented the claimant's statements were mostly credible (Exhibit 9F). Thereafter, on December 13, 2010, A. Rafael Gomez, M.D., another reviewing physician for the state agency, affirmed the opinion (Exhibit 12F). The undersigned gives significant weight to the opinions of Dr. Wirts and Dr. Gomez because their opinions are consistent with the record as a whole.

(Tr. at 21-23.)

The ALJ concluded that Claimant is capable of performing past relevant work as an automobile insurance agent, which work does not require the performance of work-related activities precluded by Claimant's RFC:

> At the hearing, the impartial vocational expert, Patricia Posey, testified the claimant had past relevant work as an automobile insurance agent, which is skilled work and actually performed at the light exertional level. Ms. Posey noted that according to the Dictionary of Occupational Titles, the claimant's past work as an insurance agent is generally performed at the sedentary exertional level. In addition, Ms. Posey noted the claimant's past relevant work as an automobile insurance agent would not be excluded by the residual functional capacity discussed earlier in the decision. Accordingly, in comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed.

(Tr. at 24.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a) and 416.945(a) (2011).

47

"This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2011).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269,

1276 (3d Cir. 1987).    Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe.  Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

Contrary to Claimant's assertions, the ALJ took into consideration Dr. Monderewicz's opinion that Claimant "should avoid maintaining the legs in a prolonged dependent position with sitting, standing, and driving due to swelling of the ankle joints" when the ALJ reduced Claimant's RFC to permit Claimant "to sit or stand at 15 to 30 minute intervals," which would permit Claimant  to "avoid maintaining her legs in a *prolonged* dependent position."  (Tr. at 18, 377.)  Dr. Monderewicz does not state that Claimant must elevate her legs during the day as described by Claimant.  (Pl.'s Br. at 8; Tr. at 372-77.)

Regarding Claimant's assertion that the ALJ's RFC did not properly include limitations on handling and fingering as found by Dr. Wirts, the undersigned notes that Dr. Wirts stated that Claimant's limit here is only "occasional".  (Tr. at 399;  Pl.'s Br. at 8-9.)  As pointed out by the Commissioner, a job as an automobile insurance agent is consistent with this de minimus limitation.  (Def.'s Br. at 15.)

Regarding Claimant's assertion that the ALJ failed to include Claimant's limitations in concentration, persistence, or pace in the hypotheticals or RFC, the undersigned finds that the ALJ noted that Ms. Robinson found that Claimant's concentration was "no more than mildly limited, and her persistence and pace were within normal limits (Exhibit 6F). Nevertheless, the undersigned gives the claimant the benefit of the doubt with regard to her alleged difficulty concentrating, and therefore finds she has a moderate limitation in the area of concentration, persistence, and pace." (Tr. at 17; Pl.'s Br. at 9-10.)  Contrary to

Claimant's assertions, the ALJ did account for this limitation by limiting the RFC and his hypothetical to the VE to "work performed in a low stress work environment, defined as one in which there is no production pace, no strict quota requirements, no strict time standards, and no 'over the shoulder' supervision" (Tr. 17, 26).

Thus, the undersigned proposes that the presiding District Judge **FIND** that the ALJ properly assessed Claimant's RFC, accounting for Claimant's functional limitations that are well supported by the evidence of record, and posed a valid hypothetical to the VE.

Credibility Determination

Claimant next argues that the ALJ erred because the reasons he provided for finding Claimant "not credible are either not true, irrelevant or legally inappropriate." (Pl.'s Br. at 10.) More specifically, Claimant asserted:

> The ALJ applied the wrong legal standard. The regulations at 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4) instruct the ALJ to evaluate the consistency of a claimant's statements not against the ALJ's RFC assessment, but rather the evidence of record...

> The ALJ further erred when he did not fulfill his legal duty to consider third party statements addressing Ms. Fouch's allegations and limitations...Ms. Fouch's mother provided a third party statement that fully corroborated Ms. Fouch's allegations. (Tr. 276-77.) The ALJ ignored this statement.

> To the extent the ALJ purported to consider the record in making the credibility determination, his findings do not support the conclusion that Ms. Fouch's allegations are not credible. The ALJ claimed Ms. Fouch had no medical treatment from the time shortly after the car wreck until shortly after Ms. Fouch filed her claim for benefits. (Tr. 20.) Ms. Fouch has already addressed this incorrect assertion above.

> The ALJ also found relevant that Ms. Fouch had worked over two years prior to her alleged onset date. (*Id.*) The ALJ offered no explanation how Ms. Fouch's ability to work over two years prior to her alleged onset date was relevant to her ability to work since March 2010.

> The ALJ claimed Dr. Monderewicz's "findings" were inconsistent with Ms.

Fouch's statements regarding her ankle impairments but failed to discuss which statements he found to be inconsistent.  (*Id.*)...

The ALJ next claimed the evidence was inconsistent with Ms. Fouch's mental allegations.  (Tr. 21.) However, the ALJ entirely ignored Dr. Thornton's opinion...

The ALJ then claimed Ms. Fouch left her job to take care of her parents.  The overwhelming evidence of records shows this assertion is not true...

\*          \*          \*

Finally, the ALJ claimed Ms. Fouch's daily activities were not consistent with her allegations.  (Tr. 21, 22).  The ALJ's conclusion here is a classic case of forbidden tactic of selective citation...Had the ALJ considered the actual contents of the record he would have seen Ms. Fouch prepares "mostly sandwich or frozen dinners."  (Tr. 218, 239)...Ms. Fouch takes particular offense with the ALJ's knowing mischaracterization of swimming...She went on to explain her efforts to use the pool for pain relief.

(Pl.'s Br. at 10-14.)

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant was not credible.  (Tr. at 16-20.)  More specifically, the Commissioner argues that:

Here, Plaintiff's primary complaints were alleged symptoms of pain.  The ALJ properly evaluated the factors relating to symptoms of pain pursuant to C.F.R. § § 404.1529(c)(3), 416.929(c)(3) and Craig v. Chater, 76 F.3d 585, 594-95 (4th Cir. 1996)...Specifically, the ALJ noted the following evidence from the record is such that a reasonable mind might accept that Plaintiff lacked credibility:

A.  Plaintiff worked with the same alleged symptoms in 2007.  In Plaintiff's initial SSI and DIB applications she alleged that a right ankle injury, depression, and other mental problems prevented her from working starting in 2006 (Tr. 161-66, 169-72).  Nevertheless, Plaintiff continued to work through 2007...The ALJ correctly pointed out this discrepancy in his opinion (Tr. 20)...

B.  Plaintiff worked again in 2010 and told her primary care physician that she left that job to take care of her mother.  In 2010, despite her alleged symptoms, Plaintiff went to work again.  This time she worked as a sales clerk (Tr. 272).  The ALJ noted in his opinion, that Plaintiff told her primary care

physician that she stopped that job - not because of her alleged symptoms - but rather "to take care of her mother[,] 75 y[ear] o[ld]" (Tr. 22, 364).  In her brief, Plaintiff argues that months after she filed for disability, she started to tell her treaters that she quit her job because of physical and mental condition (Pl.'s Br. at 16; Tr. 57).  Plaintiff's argument does nothing more than further point out the inconsistency in her statements.

C.  <u>Plaintiff had virtually no treatment of her symptoms until she filed her disability claim</u>.  The ALJ next pointed out that the evidence of record indicate that Plaintiff had virtually no treatment between 2007 and right after she filed her disability claim in April 2010 (Tr. 20).  Plaintiff admits she was not seeing an orthopedist, but counters that she did treat with Anita Dawson, a family physician, during that time (Pl.'s Br. at 16; Tr. 57).  The problem with Plaintiff's argument is that "there is no evidence of record corroborating the [Plaintiff's] testimony" that she treated with Dr. Dawson (Tr. 22).  Specifically, the Commissioner requested records from Dr. Dawson and did not receive any (Tr. 100, 103, 106). [Footnote 7: It is Plaintiff's burden of proof to produce evidence of disability.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).]...Finally, Plaintiff testified that she lived in Florida for at least part of the relevant time, precluding her from treating with Dr. Dawson in West Virginia.

D.  <u>Plaintiff's medical records contradict her complaints</u>...While Plaintiff argues in her brief that the ALJ "failed to discuss which statements he found to be inconsistent," the ALJ spent nearly a half page of his opinion doing so (Compare Pl.'s Brief at 12 with Tr. 20)...

E.  <u>Plaintiff's daily living activities negate her credibility</u>.  Finally, the ALJ noted that Plaintiff's daily living activities negated her complaints that she is so functionally limited that she "l[ies] in the bed most of the time" (Tr. 19, 21, 38)...

Footnote 8: Plaintiff also argues that the ALJ erred by not considering a written witness statement submitted by her mother (Pl.'s Br. at 14).  Like her other arguments, this argument is erroneous too.  The ALJ asked Plaintiff a question about her mother's witness statement during the hearing (Tr. 47, 276).  That question is sufficient to indicate that the ALJ considered it.  <u>Ratcliffe v. Astrue</u>, No. 08-310, 2009 WL 803113, at *8 (W.D.V.A. March 25, 2009)(finding in response to the same argument that "[t]he ALJ is not obligated to discuss every single piece of evidence in the record, and his failure to cite a specific piece of evidence is not an indication that the evidence was not considered.")  Moreover, the statement of Plaintiff's mother does not describe any alleged material limitations beyond those that had already been described by Plaintiff herself and validly rejected by the ALJ.  Thus, even if the ALJ had not considered the statement, Plaintiff cann show

that the statement would have caused the ALJ to change his opinion.  See generally, Shinseki v. Sanders, 129 S.Ct. 1696, 1706 (2009).

(Def.'s Br. at 16-20.)

Claimant asserts in a reply brief:

Ms. Fouch first argued that the ALJ had applied an incorrect legal standard when deciding her credibility…The Commissioner did not address or defend this argument.

The Commissioner first argues that Ms. Fouch worked "…in 2007 with the same symptoms she alleges prevented her from working in 2010." (Def.'s Br., Doc. 14 at 17)…the record does show her condition worsened.  Ms. Fouch testified that she had to elevate her feet due to swelling up to four hours during the day. (Tr. 51)…Ms. Fouch obviously could not have been sitting with her feet elevated while working in 2007.

Ms. Fouch has fully addressed in her previous brief the issue of why she stopped her last part-time job in 2010…Ms. Fouch readily concedes that there is one notation in this record that says she moved to Chapmanville to care for her mother.  (Tr. 364).  However, there are no less than five other sources in this record that unanimously state Ms. Fouch is not working due to her medical condition.  (Tr. 460, 367, 486, 57, 60, 276).  The point here is that the ALJ selectively cited to one erroneous piece of evidence that supported his decision while ignoring voluminous evidence contrary to his position. Selective citation is not permissible in this Circuit.  Hines v. Barnhart, 453 S.E.2d 559, 566 (4th Cir. 2006).

The Commissioner next parrots the ALJ's erroneous contention that Ms. Fouch did not receive medical treatment from 2007 until 2010…In response to the Commissioner's argument on this issue, Ms. Fouch would pose two questions.  First, what is a claimant supposed to do when a treating physician cannot or will not produce the medical records in response to requests for the records by the claimant, the claimant's lawyer and the Administration? Secondly, why did the ALJ not issue a subpoena for the records if he felt they were so important after Ms. Fouch specifically identified the treating source to the ALJ?

Footnote 2:…News reports indicate Dr. Dawson's clinic was being "raided" by the FBI, and she was facing disciplinary proceedings before the WV Board of Osteopathy in 2010, the same time Ms. Fouch filed her application. It appears Dr. Dawson had more pressing matters facing her than responding to records requests.]…

Finally, in footnote 8, the Commissioner defends the ALJ's failure to consider third party statements as part of the credibility determination...The Commissioner is incorrect. At page 47 of the transcript, Ms. Fouch was being questioned by her attorney, not the ALJ...Thus, Ms. Fouch stands by her earlier assertion that the ALJ entirely ignored the third party statement contrary to his legal duty to consider such statements set forth in the regulations. SSR 96-7p, 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

(Pl.'s Reply Br. at 7-9.)

The ALJ made extensive findings regarding Claimant's credibility and followed the two-step process based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p:

The claimant alleges disability due to an injury of the right ankle, mental problems from a head injury, and depression (Exhibit 2E). The claimant indicated having difficulty walking up steps due to pain of her right ankle. She noted having difficulty doing household chores. The claimant reported having crying spells. She indicated having anxiety, as well as a sleep disorder. Also, that her relationships have been affected due to her pain (Exhibit 1E). At the hearing, the claimant testified that she is unable to stand for long periods. The claimant noted that she has trouble remembering and gets "really nervous." She noted that she lies in her bed most of the time. She has constant pain of her right ankle. She described the pain as dull, throbbing, and stabbing. The claimant noted that walking, lifting, or carrying something heavy caused an increase of pain. Also, the claimant noted having pain and numbness of the right elbow and hand. She has problems when she is trying to write something with her dominant right hand, or when she is trying to "hold onto something." The claimant indicated that she has had surgery six times since her motor vehicle accident. She noted holding onto a railing when walking up stairs. She also has pain of her left ankle. The claimant indicated that she could comfortably walk on level ground for approximately ten minutes. However, after ten minutes she would have to lean or something or prop her right foot up before starting to walk again. The claimant is in a seated position with her foot elevated at least four hours per day. The claimant noted that she fell carrying her 20-pound grandson a few months ago. She can no longer lift him. In addition, the claimant stated that she experiences panic attacks daily. The panic attack usually lasts for around five minutes. Subsequent to the panic attacks, the claimant feels dizzy and lightheaded. The claimant noted that she has flashbacks about the motor vehicle accident. The claimant indicated having nightmares and difficulty sleeping.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The objective evidence of record does not support the claimant's extreme physical complaints and limitations, and reveals that the claimant's allegations are not fully credible. As noted above, the undersigned recognizes the claimant injured her bilateral ankles in a motor vehicle accident on September 11, 2006 (Exhibit 1F). However, the evidence of record indicates the claimant has had virtually no treatment after her motor vehicle accident and recovery until right after she filed her claim for disability in April of 2010. In addition, the undersigned notes that after the claimant's earnings records for 2007, the year after her accident, were at the level of substantial gainful activity (Exhibit 6D). Further, the undersigned notes there is absolutely no evidence to suggest an aggravation of her ankle injuries that would prevent her from continuing to work.

Nevertheless, the undersigned recognizes that notes from the claimant's physical consultative examination with Dr. Monderewicz dated in July of 2010, indicated the claimant had tenderness and swelling of the right ankle; however, she had no evidence of warmth. In addition, the undersigned recognizes the claimant had swelling and increased warmth of the left ankle; however, she had no evidence of swelling. Also, Dr. Monderewicz documented the claimant had no tenderness, swelling, erythema, increased warmth, or crepitus of the forefeet (Exhibit 7F, p. 5). Additional notes indicated the claimant did not require the use of a handheld assistive device (Exhibit 7F, p. 3). Further notes documented the claimant appeared stable in the supine and seated positions (Exhibit 7F, p. 3). In fact, notes from the examination documented the claimant underwent straight leg raise testing in the seated and supine positions, which was negative. The undersigned recognizes the claimant had decreased sensation to pin prick over the right foot; however, her leg strength was normal of the bilateral lower extremities (Exhibit 7F, p. 5). Further, the physician noted the claimant had no evidence of hip problems, and there was no discrepancy of leg length (Exhibit 7F). The undersigned notes that the findings noted above are inconsistent with the severity of the claimant's allegations with regard to her problems of the bilateral ankles. Moreover, the undersigned has accounted for limitations resulting from the impairments in the residual functional capacity discussed earlier in the decision.

In terms of the claimant's status-post injury of the right elbow, as noted above, a Discharge Summary from Charleston Area Medical Center dated

September 19, 2006, documented the claimant had a diagnosis of fracture of the right elbow (Exhibit 2F). However, notes from the day of the claimant's motor vehicle accident indicated that she underwent x-rays of the right elbow, which showed findings consistent only with a laceration with foreign debris within the soft tissue. In fact, the x-rays revealed no gross signs of acute fracture or dislocation (Exhibit 2F, p. 15). Also, an x-ray of the claimant's right forearm showed no signs of fracture or dislocation (Exhibit 2F). Further, the claimant underwent x-rays of the right wrist and hand, which showed no signs of acute fracture or dislocation. The undersigned recognizes the x-rays showed postoperative changes of the claimant's fifth metacarpal; however, this was from a prior injury and not related to the claimant's current allegations. The undersigned notes that the radiological findings noted above are inconsistent with the severity of the claimant's allegations. Furthermore, the claimant's treatment records indicate that she underwent very little, if any, treatment of the right upper extremity subsequent to her motor vehicle accident. Furthermore, notes from the claimant's physical consultative examination with Dr. Monderewicz indicated the claimant had no more than a mildly weak right rip, and her fine manipulation was normal bilaterally (Exhibit 7F, p. 6). In fact, the claimant was able to write with the dominant right hand, and pick up coins bilaterally without difficulty. Also, the range of motion of her right hand was within normal limits (Exhibit 7F, p. 4). Moreover, the undersigned has given the claimant the benefit of the doubt with regard to her impairment of the right upper extremity, and therefore made the impairment severe.

In terms of the claimant's obesity, as noted above, the claimant's obesity is evaluated under multiple listings. As indicated in SSR 02-1p, obesity may have adverse impact upon co-existing impairments. These considerations have been taken into account not only in determining whether the claimant has an impairment that is severe but also in reaching all conclusions herein.

***Please see pages 32-36 of this PF&R for the ALJ's further discussion of Claimant's credibility.***

(Tr. at 19-24.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the

finding about the credibility of the individual's statements.  The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record.  This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's subjective complaints of pain, the court proposes that the presiding District Judge find that the ALJ properly weighed Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.  20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

Contrary to Claimant's assertion, the ALJ did not "appl[y] the wrong legal standard." (Pl. Br. at 11; Pl. Reply Br. at 7.)   The ALJ did not evaluate the consistency of Claimant's statements against the ALJ's RFC assessment as alleged, but rather the ALJ clearly evaluated the totality of the evidence of record.  In his decision, the ALJ determined that

Claimant had medically determinable impairments that could cause her alleged symptoms. (Tr. at 20.)  The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication.  (Tr. at 19-24.)  The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the extent of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform her past relevant work, and her broad range of self-reported daily activities. Id.  The ALJ thoroughly reviewed the record, was present and attentive during Claimant's representative's questioning regarding the third party statement of Claimant's mother, and went on to extensively question Claimant following her testimony.  (Tr. at 47, 54-62.)

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period

may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

  February 13, 2013  
    Date

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge